**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 21-1256

AMALGAMATED TRANSIT UNION LOCAL 85; JAMES
HANNA; SASHA CRAIG; MONIKA WHEELER

v.

PORT AUTHORITY OF ALLEGHENY COUNTY,
Appellant
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 2-20-cv-01471)
District Judge: Honorable J. Nicholas Ranjan
_____

Argued: December 7, 2021

Before: SHWARTZ, PORTER, and FISHER,
*Circuit Judges*.

(Filed: June 29, 2022)
_____

Brian P. Gabriel
Campbell Durrant Beatty Palombo & Miller
535 Smithfield Street
Suite 700
Pittsburgh, PA 15222

Gregory J. Krock **[ARGUED]**
McGuireWoods
260 Forbes Avenue
Suite 1800
Pittsburgh, PA 15222

 *Counsel for Appellant Port Authority of Allegheny County*

Patrick K. Lemon
Joseph J. Pass **[ARGUED]**
Jubelirer Pass & Intrieri
219 Fort Pitt Boulevard
1st Floor
Pittsburgh, PA 15222

 *Counsel for Appellees Amalgamated Transit Union Local 85, James Hanna, Sasha Craig, and Monika Wheeler*

———————————

OPINION OF THE COURT

———————————

**PORTER**, *Circuit Judge*.

Beginning in April 2020, the Port Authority of Allegheny County ("Port Authority") required its uniformed employees to wear face masks at work. Some employees wore masks bearing political or social-protest messages. Concerned that such masks would disrupt its workplace, Port Authority prohibited them in July 2020. When several employees wore masks expressing support for Black Lives Matter, Port Authority disciplined them under this policy. In September 2020, Port Authority imposed additional restrictions, confining employees to a narrow range of masks. Together with their union, Amalgamated Transit Union Local 85 ("Local 85"), the employees sued, alleging that Port Authority had violated their First Amendment rights.[1] The District Court entered a preliminary injunction rescinding discipline imposed under the July policy and preventing Port Authority from enforcing its policy against "Black Lives Matter" masks. Port Authority appeals.

The government may limit the speech of its employees more than it may limit the speech of the public, but those limits must still comport with the protections of the First Amendment. Port Authority bears the burden of showing that

———————————

[1] Employees and Local 85 amended their complaint to reflect the September policy.

its policy is constitutional. It has not made that showing. We will affirm the District Court's order.

# I

As part of its response to the Covid-19 pandemic, Port Authority, a municipal bus and light-rail operator, required its uniformed employees to wear face masks.[2] Initially, Port Authority was unable to procure masks for all its employees, so they were required to provide their own. Some employees wore masks bearing political or social-protest messages including "Black Lives Matter" and "Trump 2020," as well as masks expressing support for the police and criticizing mask mandates.

Port Authority has long prohibited its uniformed employees from wearing buttons "of a political or social protest nature." App. 681. Port Authority extended this prohibition to face masks in July 2020. The policy prohibited "[b]uttons, stickers, jewelry, and clothing (including masks or other face coverings) of a political or social protest nature." App. 679–84. Port Authority disciplined employees Sasha Craig, Monika Wheeler, and James Hanna ("Employees") for violating this policy.

In September 2020, as Port Authority became able to procure more masks, it revised its uniform policy again. The new policy leaves the "political or social protest" restriction in place and adds a new "Masks and Other Face Coverings" section detailing which masks may be worn. App. 668. The

---

[2] Port Authority no longer requires employees or riders to wear masks. *See Face Coverings*, Port Authority, https://perma.cc/354P-U9TX (last visited May 26, 2022).

4

revised policy expressly permits masks with the Port Authority or Local 85 logo. It also permits Port Authority-issued surgical masks and solid black or blue masks or gaiters, as well as white, blue, or black N-95 and KN-95 masks and clear face shields, whether issued by the Port Authority or belonging to the employee. If an employee brings a face shield, N-95, or KN-95 mask from home it may "not have any visible logos, images, texts or other markings" and the "head band . . . must be solid white, blue or black." App. 669. The policy provides that "no other masks or face coverings are permitted to be worn while on duty," and prohibits alteration of permissible masks. App. 669.

Before the District Court, Port Authority's Chief Legal Officer testified that the purpose of the new policy was "to make it easier for employees to comply with" the ban on political and social-protest masks and avoid any "gray area, a question is that a political message, is that a social protest message." App. 529.

Port Authority enforced its pin-and-button prohibition laxly. Before the District Court, bus operators testified that they and others wore buttons supporting "Bernie Sanders, Hillary, Trump, Obama, Biden" and candidates for local and union office. App. 483. One bus operator described employees as "wear[ing] buttons on their sweaters as though they are military type . . . medals." App. 485. Wearing these buttons did not occasion discipline, even though doing so violated Port Authority's long-standing uniform policies. Other employees, including instructors, also wore political buttons without incident.

Like its employees, Port Authority speaks on political and social issues. Port Authority endorses Black Lives Matter

5

and decorates buses to celebrate causes it supports. Buses bearing images of beer cans and buses decorated to support gay pride caused controversy among employees. A manager threatened to discipline employees who refused to drive the gay-pride bus, but it appears that no one was disciplined. Some employees also reportedly resisted driving the beer-can bus, though, again, the record reveals no associated disciplinary action.

Masks commenting on social issues have not interrupted Port Authority's operations, though they have created tension among Port Authority employees. Port Authority's general counsel was not aware of any disruption to service through September 2020, when the revised mask policy came into effect.

Port Authority is particularly concerned about the disruptive potential of racial discord. Black Lives Matter demonstrations in Pittsburgh precipitated rioting and property damage in 2020. Port Authority has also had some problems with racial tensions in the past.

## II

The District Court had subject-matter jurisdiction under 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1292(a)(1). We review the District Court's grant of a preliminary injunction for abuse of discretion. *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 156 (3d Cir. 2002). But "determinations made in assessing each [preliminary injunction] factor are reviewed according to the standard applicable to those particular determinations." *Swartzwelder v. McNeilly*, 297 F.3d 228, 234 (3d Cir. 2002). Our review of the District Court's conclusions of law and

6

application of law to fact is plenary. *Tenafly*, 309 F.3d at 156. "Although we normally will not disturb the factual findings supporting the disposition of a preliminary injunction motion in the absence of clear error, we have a constitutional duty to conduct an independent examination of the record as a whole when a case presents a First Amendment claim." *Brown v. City of Pittsburgh*, 586 F.3d 263, 268–69 (3d Cir. 2009) (quoting *Child Evangelism Fellowship of N.J. v. Stafford Twp. Sch. Dist.*, 386 F.3d 514, 524 (3d Cir.2004)).

**III**

To determine whether a preliminary injunction should issue, a court must consider "(1) whether the movant has a reasonable probability of success on the merits; (2) whether irreparable harm would result if the relief sought is not granted; (3) whether the relief would result in greater harm to the non-moving party, and (4) whether the relief is in the public interest." *Swartzwelder*, 297 F.3d at 234.

The first two factors are prerequisites that the moving party must establish. *See Greater Phila. Chamber of Com. v. City of Phila.*, 949 F.3d 116, 133 (3d Cir. 2020). If these "gateway factors" are established, the "court then determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.* (internal quotation marks omitted). But "[i]n First Amendment cases the initial burden is flipped. The government bears the burden of proving that the law is constitutional; thus, the plaintiff must be deemed likely to prevail if the government fails to show the constitutionality of the law." *Id.* (internal quotation marks omitted).

7

## A

We first consider whether Port Authority has shown that it is likely to succeed on the merits. At this stage, at least, Port Authority has not.

### 1

Speech by government employees receives less protection than speech by members of the public. Historically "a public employee had no right to object to conditions placed upon the terms of employment—including those which restricted the exercise of constitutional rights." *Connick v. Myers*, 461 U.S. 138, 143 (1983). But in time, the risk that "government employees could be prevented or 'chilled' by the fear of discharge from joining political parties and other associations" led courts to adopt a balancing test, weighing an employee's interest in speaking against a government employer's interest in quelling that speech. *Id.* at 145.

Two threshold requirements must be met for employee speech to qualify for interest balancing. First, employees must speak "as citizens" rather than "pursuant to their official duties." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). If an employee's job is to speak, the First Amendment does not prevent a government employer from controlling the speech for which the employee is employed. *Id.* at 421–22. Second, employees must speak on "matters of public concern" rather than mere "personal interest." *Borden v. Sch. Dist. of Twp. of E. Brunswick*, 523 F.3d 153, 168 (3d Cir. 2008). If an employee speaks "upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the

8

employee's behavior." *Connick*, 461 U.S. at 147. "Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community," or when it "is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (internal quotation marks omitted).

The conduct of Port Authority's employees satisfies both prerequisites. Port Authority did not hire these employees to express their views on political and social issues. So, their speech on these issues was not "pursuant to their official duties." *Garcetti*, 547 U.S. at 421. Port Authority's mask rules restrict speech on matters of public concern. "Black Lives Matter," "Thin Blue Line," and anti-mask-mandate masks all comment on matters of "political [or] social . . . concern to the community" that are "subject[s] of legitimate news interest." *Snyder*, 562 U.S. at 453. Indeed, Port Authority imposed its restrictions to prevent commentary on political and social issues. To establish the constitutionality of its policies, therefore, Port Authority must show that its interests outweigh those of its employees.

**2**

Two precedents govern our analysis. *Pickering v. Board of Education* establishes that when considering a restriction on employee speech, courts must "arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." 391 U.S. 563, 568 (1968). How we weigh these considerations depends on whether the employer imposed a prior restraint on speech or disciplined an

employee after the fact. *United States v. National Treasury Employees Union* "clarified how courts should apply *Pickering* when a restriction operated as an *ex ante* prohibition on speech." *Lodge No. 5 of Fraternal Ord. of Police ex rel. McNesby v. City of Phila.*, 763 F.3d 358, 368 (3d Cir. 2014) (citing *United States v. Nat'l Treasury Emps. Union* (*NTEU*), 513 U.S. 454, 467 (1995)). When a "ban chills potential speech before it happens . . . . the Government's burden is greater . . . than with respect to an isolated disciplinary action." *NTEU*, 513 U.S. at 468. In prior-restraint cases, courts must consider not just the specific speech that concerned the government, but the "broad range of present and future expression" that the rule chills and the interests of present and future speakers and audiences. *Id.*

In this case, we have both discipline imposed on employees after they had engaged in certain speech and a policy that prohibited or restrained future speech. *Pickering* governs the former while *NTEU* governs the latter.

**a**

To determine whether the discipline meted out under the July policy violated the First Amendment, *Pickering* requires that we balance (1) the interest of the employee, "as a citizen, in commenting upon matters of public concern," against (2) "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568. This balancing test is a "fact-intensive inquiry that requires consideration of the entire record, and must yield different results depending on the relative strengths of the issue of public concern and the employer's interest." *Munroe v. Cent. Bucks Sch. Dist.*, 805 F.3d 454, 472 (3d Cir. 2015), *as amended* (Oct.

10

25, 2019). In other words, the inquiry "involves a sliding scale" where "the amount of disruption a public employer has to tolerate is directly proportional to the importance of the disputed speech to the public." *Id.*

The Employees' masks bore messages relating to matters of public concern on which they had a strong interest in commenting. *See id.* at 473 ("[S]peech involving government impropriety occupies the highest rung of First Amendment protection"); *Love-Lane v. Martin*, 355 F.3d 766, 778 (4th Cir. 2004) (assistant principal had an "especially strong interest" in criticizing in-school racial discrimination). By contrast, Port Authority can demonstrate an only minimal risk that the Employees' speech would cause workplace disruption. The record shows a lone employee complaint, three race-related incidents among Port Authority employees within the past fifteen years, wholly unrelated to and predating the mask rules, and electronic messages among employees expressing differing opinions about the Black Lives Matter movement. Moreover, Port Authority itself supported the Black Lives Matter movement after the July policy was in place, previously supported African-American Heritage celebrations, and consistently allowed employees to wear political buttons and hats in violation of its uniform policy, all without precipitating the disruption it contends the Employees' masks are likely to cause. Thus, the record does not "establish[] that disruption is likely to occur because of" the Employees' "Black Lives Matter" masks. *Munroe*, 805 F.3d at 472. Accordingly, Local 85 has shown a likelihood of success in proving that disciplining the Employees for wearing Black Lives Matter masks pursuant to the July policy violated the First Amendment.

11

**b**

We apply *NTEU* to Port Authority's September policy confining employees to a narrow range of masks. In prior-restraint cases we consider not just the speech that concerned the government, but all present and future expression that the rule may chill. *NTEU*, 513 U.S. at 468. The government bears the burden of showing that the "necessary impact on the actual operation of the Government" outweighs that interest. *Id.* (internal quotation marks omitted). To satisfy this requirement, Port Authority "must make two showings: first, that it has [identified] 'real, not merely conjectural' harms; and second, that the ban as applied . . . addresses these harms in a 'direct and material way.'" *Fraternal Order of Police*, 763 F.3d at 370 (quoting *NTEU*, 513 U.S. at 475).

**i**

"To demonstrate real, not merely conjectural harms, a government must not only identify legitimate interests, but also provide evidence that those concerns exist." *Id.* (internal quotation marks omitted). "The government need not show the existence of actual disruption if it establishes that disruption is likely to occur because of the speech." *Munroe*, 805 F.3d at 472. Here, masks bearing political and social-protest messages did cause controversy. Employees engaged in heated arguments about the views expressed on such masks. Management became involved because an employee complained about a "Black Lives Matter" mask. And the serious disruption caused by protests and riots following Pittsburgh's Black Lives Matter demonstrations justified Port Authority's concern that more severe disruption would likely follow mask-related controversy. In addition, Port Authority has demonstrated that the disruptive potential of political

12

speech is not unique to present-day circumstances. Political speech disrupted Port Authority's operations in the past; its long-standing ban on political buttons was drafted in response to an employee strike.

But there is also evidence that a wide range of political and social-issue speech is not disruptive. Despite Port Authority's policy, employees have long worn political buttons without disrupting Port Authority's operations. Moreover, employee dissension incited by Port Authority's own social-issue speech did not interfere with Port Authority's operations. These facts illustrate that even controversial speech on political and social issues often does not disrupt Port Authority's operations.

Port Authority's fear that "Black Lives Matter" and other controversial masks might cause disruption to its service is more than merely conjectural. But Port Authority has not shown that the "broad range of present and future expression" its policy forbids will disrupt operations. *NTEU*, 513 U.S. at 468.

## ii

For its September policy to survive *NTEU* balancing Port Authority must show that its policy is narrowly tailored to the "real, not merely conjectural" harm it identified. *Fraternal Order of Police*, 763 F.3d at 370 (quoting *NTEU,* 513 U.S. at 475). Port Authority has not made this showing.

Under *NTEU*, "[w]hen the Government defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it must do more than simply posit the existence of the disease sought to be cured. It must

13

demonstrate . . . that the regulation will in fact alleviate these harms in a *direct and material way*." *Fraternal Order of Police,* 763 F.3d at 369 (alteration and emphasis in original) (internal quotation marks omitted) (quoting *NTEU*, 513 U.S. at 475); *see also Swartzwelder*, 297 F.3d at 236 ("[A] tailoring requirement . . . seems to be implicit in the [Supreme] Court's discussion."). Proper tailoring does not require the regulation to redress the harm entirely or that the regulation sweeps in no harmless speech: Port Authority's policy need not be "perfectly tailored." *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 454 (2015) (quoting *Burson v. Freeman*, 504 U.S. 191, 209 (1992)). "But when the burden comes closer to impairing core first amendment values, or impairs some given first amendment value more substantially, the requisite closeness of fit of means and end increases accordingly." *Fraternal Order of Police*, 763 F.3d at 375 (internal quotation marks omitted).

In some respects, Port Authority's uniform policy is overbroad. It sweeps in the wide array of social-issue and political speech in which Port Authority employees have long engaged without causing disruption. *See e.g.*, *Swartzwelder*, 297 F.3d at 238–39 (holding that a rule governing all expert testimony by police officers was insufficiently tailored to the interests of preventing officers from revealing confidential information or missing work). This breadth is especially suspect because the ban affects "core" political speech, an area where fit must be particularly close. *See Connick*, 461 U.S. at 145 ("[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values[] and is entitled to special protection." (internal quotation marks omitted)); *see also Fraternal Order of Police*, 763 F.3d at 375. Port Authority defends the breadth of its policy because it "make[s] it easier for employees to comply." App. 529. But the Supreme Court

14

has disapproved administrative convenience as a justification for broad bans on government-employee speech. *NTEU*, 513 U.S. at 474.

In other respects, Port Authority's policy is underinclusive. Port Authority employees are permitted to engage in political speech in other ways, such as through oral or written communication. That speech has the same, if not more, potential to cause disruption. Although the First Amendment does not necessarily prohibit underinclusive policies, underinclusiveness is relevant if it "reveal[s] that a law does not actually advance a compelling interest." *Williams-Yulee*, 575 U.S. at 449 ("[A] State's decision to prohibit newspapers, but not electronic media, from releasing the names of juvenile defendants suggested that the law did not advance its stated purpose of protecting youth privacy."). Port authority must "show[] how the ban has any causal impact on its stated harms," so its failure to target equally disruptive speech is probative. *Fraternal Order of Police*, 763 F.3d at 384.

For many years, Port Authority has not enforced its political-button prohibition. And it became concerned about political masks in response to growing division over the messages on those masks. These facts suggest that prevailing political conditions, rather than employees' mode of speech, dictates how contentious employees' workplace political debates will be. Port Authority makes no showing that preventing mask-related disputes will redress the disruption it fears. That suggests Port Authority's policy "permit[s] many of the harms that [Port Authority] purportedly seeks to address" and that the "ban is illogically under-inclusive" and,

so, fails to satisfy the narrow tailoring requirement. *Fraternal Order of Police*, 763 F.3d at 384.

Some considerations cut in Port Authority's favor. Port Authority's policy applies only to speech at the workplace expressed using masks. Limiting restrictions to working hours has weighed in favor of employers in other circuits. *See, e.g.*, *Commc'ns Workers of Am. v. Ector Cnty. Hosp. Dist.*, 467 F.3d 427, 442 (5th Cir. 2006) ("A strong argument can be made that governmental employer genuine and essentially neutral uniform anti-adornment policies, administered without discrimination, applicable only to employees while on duty, will of themselves almost always pass *Pickering* balancing."). In addition, the "First Amendment does not require States to regulate for problems that do not exist." *Williams-Yulee*, 575 U.S. at 451 (quoting *Burson*, 504 U.S. at 207). The discord Port Authority observed was mask-related, so naturally its solution was mask-related. Finally, as Port Authority recognizes, it should not and cannot discriminate on the basis of viewpoint. But Port Authority has not shown that a narrower policy would necessarily be viewpoint discriminatory.

The narrow-tailoring inquiry balances against Port Authority, and any uncertainty must weigh against Port Authority, as well, because Port Authority bears the burden of showing that it is likely to succeed on the merits at trial. *See NTEU*, 513 U.S. at 475 n.21 ("Deferring to the Government's speculation about the pernicious effects of thousands of articles and speeches yet to be written or delivered would encroach unacceptably on the First Amendment's protections."). Although Port Authority is right to be concerned that if its facially neutral policy does not comport with the First Amendment it may be impossible to craft one that does, "where

16

there are heavy weights on both sides of the scale—the balancing process can be performed more satisfactorily after the speech has occurred, when both its usefulness and its impact can be more accurately assessed." *Swartzwelder*, 297 F.3d at 241. So, too, "the question before us here is not even whether [the September policy] can ultimately be sustained, but only whether the District Court abused its discretion in holding that the plaintiff was likely to succeed in challenging [it]." *Id.* At this stage, Port Authority has not shown that its September policy is narrowly tailored, and, so, it has not shown that it is likely to prevail on the merits at trial.

**B**

We next consider the second preliminary injunction prerequisite: irreparable injury. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Id.* (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). When a government employer's restrictions on employee speech tread on First Amendment interests, those restrictions work irreparable injury. Port Authority's mask rules prevented employees from expressing their views on a range of issues, from race relations to mask mandates. The First Amendment protects that speech, so curtailing it inflicts an irreparable injury.

**C**

Our conclusion that Port Authority is unlikely to succeed on the merits means we find that Local 85 is likely to succeed. So we must also consider the final two preliminary injunction factors: "whether an injunction would harm the [Port Authority] more than denying relief would harm [Local 85]," and "whether granting relief would serve the public

17

interest." *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*, 910 F.3d 106, 115 (3d Cir. 2018). We must also consider whether the District Court abused its discretion in weighing all four factors against each other. *Id.*

We consider the ramifications of the injunction when analyzing the final two factors. The District Court enjoined Port Authority's rule as to speech supporting Black Lives Matter only. The injunction does not compel Port Authority to restrict speech on other viewpoints, but it fails to foreclose that outcome, raising a troubling risk of viewpoint discrimination.

On this point, the District Court spoke too broadly in declaring that "there is nothing in *NTEU*, *Pickering*, or any other precedential case from the Supreme Court or Third Circuit that forbids content or viewpoint-based discipline in the context of public employment." App. 46–47. Government speech may adopt a particular viewpoint, so long as it does not coerce private speakers into espousing a certain view. *See, e.g.*, *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207–08 (2015). But viewpoint-based government regulations on speech are nearly always presumptively suspect. *See, e.g.*, *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995).

That is no less true in the *Pickering-NTEU* context, outside of certain narrow exceptions. *See, e.g.*, *Curinga v. City of Clairton*, 357 F.3d 305, 312–14 (3d Cir. 2004) (permitting public employer to dismiss employee holding policymaking position based on political affiliation). Concern over viewpoint discrimination is the very reason *Pickering* rejected the older rule that the First Amendment does not protect government-employee speech. *Connick*, 461 U.S. at 144–45. In *NTEU*, both the majority and dissent observed that employees were not as

heavily burdened by the honoraria ban as they could have been because there was no content or viewpoint discrimination. *NTEU*, 513 U.S. at 468; *id.* at 490–91 (Rehnquist, C.J., dissenting). So if the ban had been viewpoint discriminatory, the government's burden of justification would have been even heavier. And in *Rankin v. McPherson*, an employee-speech case, the Court cautioned that *Pickering* balancing must be undertaken with "vigilance" to "ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech." 483 U.S. at 384.

We exercised such vigilance in *Swartzwelder*. There, we disapproved the vague standard applied by the government for approval of employee speech. That standard was whether the speech was "valid" in the judgment of an assistant city solicitor. *Swartzwelder*, 297 F.3d at 240. Specifically, we said that so discretionary a standard is "troubling" and "disturbing" because it "creates a danger of improper application," particularly in the hands of a single government employee. *Id.* Other circuits are similarly vigilant in requiring viewpoint neutrality. *See, e.g.*, *James v. Tex. Collin Cnty.*, 535 F.3d 365, 380 (5th Cir. 2008) (emphasizing the need for viewpoint neutrality in the *Pickering* line of cases); *Wolfe v. Barnhart*, 446 F.3d 1096, 1108–09 (10th Cir. 2006) (same) (collecting cases). So contrary to the District Court's statement, public employers do not have a free hand to engage in viewpoint discrimination toward their employees. At present, it suffices to note that the more a public employer's policy looks like viewpoint discrimination—or is likely to foster such discrimination—the less likely it will be to survive scrutiny under *Pickering-NTEU*.

**1**

As for the third preliminary injunction factor, the injunction does not harm Port Authority more than the enjoined policy would harm Port Authority's employees. *See Greater Phila. Chamber of Com.*, 949 F.3d at 133. As explained above, the Employees' masks are unlikely to cause the feared disruption, and Port Authority suffers no legitimate harm from not enforcing an unconstitutional policy. *See ACLU v. Ashcroft*, 322 F.3d 240, 250, 251 n.11 ("[N]either the Government nor the public generally can claim an interest in the enforcement of an unconstitutional [rule]."), *aff'd*, 542 U.S. 656 (2004). The injunction enjoins Port Authority from enforcing only the portion of its uniform policy that prohibits any employee from wearing masks that display "Blacks Lives Matter" or any similar messages identified during the hearing. It does not affect other uniform rules or compel their enforcement. Although Port Authority has no legitimate interest in discriminating on the basis of viewpoint by enforcing the mask rules that the District Court's injunction leaves undisturbed, the injunction does not compel Port Authority to enforce those rules, so it does not adversely affect Port Authority's interests. Finally, Local 85 would face a great harm if its members' speech was restricted based upon the viewpoint expressed.

**2**

The injunction is also in the public interest. There is a strong public interest in upholding the requirements of the First Amendment. *See id.* And, "if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff." *Am. Tel. & Tel. Co. v. Winback & Conserve*

*Program, Inc.*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994). Because Local 85 has made both these showings and considering the strong public interest in upholding the First Amendment, the public interest favors granting an injunction.

\*     \*     \*

We balance all four factors to determine if a preliminary injunction should issue. "The decision to grant or deny a preliminary injunction is within the sound discretion of the district court." *New Jersey Rifle*, 910 F.3d at 114. "Preliminary injunctive relief is an extraordinary remedy," and typically "should be granted only in limited circumstances." *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (internal quotation marks omitted). But under the mirror-image preliminary injunction analysis we apply in First Amendment cases, that rule favors the grant of an injunction. *Greater Phila. Chamber of Com.*, 949 F.3d at 133. Port Authority bears the burden of showing that it is likely to succeed at trial, and it has not made that showing as to the narrow-tailoring requirement of the *Pickering-NTEU* analysis. The harm the policy works is irreparable, and both discretionary preliminary injunction factors favor the injunction. The District Court did not abuse its discretion by issuing the preliminary injunction.

In upholding the District Court's ruling, we do not suggest that Port Authority must allow the display of all messages. For example, Port Authority could still prohibit employee masks with messages that categorically fall outside the scope of First Amendment protection, such as messages that do not implicate matters of public concern. *See Munroe*, 805 F.3d at 474. Port Authority could also prohibit messages that fall within the "well-defined and narrowly limited classes of speech, the prevention and punishment of which have never

21

been thought to raise any Constitutional problem": messages that are obscene, defamatory, fraudulent, integral to criminal conduct, or inciteful, such as "a hate group naming specific groups or individuals as targets, or specifying instructions for committing a crime." *United States v. Stevens*, 559 U.S. 460, 468–69 (2010) (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571–572 (1942); *Unites States v. Bell*, 414 F.3d 474, 483 n.10 (3d Cir. 2005). Nor do we suggest that Port Authority may discriminate on the basis of viewpoint when imposing limits on employee speech.

Our decision is narrow. We hold only that at this early stage Port Authority has not shown that its mask policies withstand constitutional scrutiny and, so, the District Court did not abuse its discretion to enjoin enforcement of that policy against "Black Lives Matter" masks. Another policy, another message, a uniform requirement, or another set of interests may be different. In each case the specific facts and circumstances will be dispositive. In this case, we will affirm the District Court.

PORTER, *Circuit Judge*, concurring.

*Pickering v. Board of Education* invites judges to "balance" government employees' First Amendment interest in speaking on matters of public concern against "the interest of the State, as an employer." 391 U.S. 563, 568 (1968). And so we have. But I write separately to observe that, applying basic First Amendment principles, Port Authority's July restriction on "masks or other face coverings[] of a political or social protest nature" fails before balancing even begins. App. 681.

*Pickering* itself is "rooted" in cases rejecting the rule that the First Amendment did not protect government-employee speech. *Connick v. Myers*, 461 U.S. 138, 144 (1983). Specifically, the Court feared that the government would discriminate on the basis of viewpoint. *Id.* at 144–45. The Court reiterated this concern in *United States v. National Treasury Employees Union* (*NTEU*). 513 U.S. 454, 468 (1995) ("Although § 501(b) neither prohibits any speech nor discriminates among speakers based on the content or viewpoint of their messages, its prohibition on compensation unquestionably imposes a significant burden on respondents' expressive activity.").

Another way of saying this, using a more recent Supreme Court locution, is that "all forms of content-based restrictions must be capable of reasoned application." *Ctr. for Investigative Reporting v. Se. Pa. Transp. Auth.* (*SEPTA*), 975 F.3d 300, 313–14 (3d Cir. 2020) (citing *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1892 (2018)). In *Minnesota Voters Alliance v. Mansky*, the Supreme Court held that a prohibition on wearing a "political badge, political button, or other

political insignia" failed to provide any "sensible basis for distinguishing what may come in from what must stay out." 138 S. Ct. at 1888.

The same viewpoint-discrimination concerns that gave rise to *Pickering* animate the Court's reasoned-application requirement for content-based restrictions of speech: The potential for a government entity's "'own politics [to] shape [its] views on what counts as "political"' . . . [is] precisely the problem at the heart of" that requirement. *SEPTA*, 975 F.3d at 316 (first alteration in original) (quoting *Mansky*, 138 S. Ct. at 1891). Content-based restrictions on speech must be capable of reasoned application because "an indeterminate prohibition carries with it '[t]he opportunity for abuse.'" *Mansky*, 138 S. Ct. at 1891 (alteration in original) (internal citation omitted). Although "some degree of discretion . . . is necessary" when government officials enforce speech limitations, to prevent "unfair or inconsistent enforcement," that "discretion must be guided by objective, workable standards." *Id.*

The viewpoint-discrimination concerns underlying *Pickering* and *NTEU*'s limits on government-employee speech restrictions make this reasoned-application requirement applicable in the government-employee context. The D.C., Fourth, Ninth, and Tenth Circuits have all considered viewpoint neutrality when conducting *Pickering* balancing.[1]

---

[1] *See Sanjour v. EPA*, 56 F.3d 85, 96–97 (D.C. Cir. 1995); *Adams v. Trs. of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 560–61 (4th Cir. 2011); *Barone v. City of Springfield*, 902 F.3d 1091, 1106 (9th Cir. 2018); *Wolfe v. Barnhart*, 446 F.3d 1096, 1108–09 (10th Cir. 2006).

2

Similar to the unconstitutional policy in *Mansky*, Port Authority's prohibition on "masks or other face coverings[] of a political or social protest nature" defies reasoned application, lacks objective, workable standards, and invites viewpoint discrimination. App. 681. The July policy—a content-based prohibition on speech—is too ill defined to pass constitutional muster under any balancing test.