**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 23-3165
_____

FRATERNAL ORDER OF POLICE PENNSYLVANIA LODGE; SPRINGFIELD
TOWNSHIP POLICE BENEVOLENT ASSOCIATION; CHRISTIAN WILBUR;
ROBERT BAIADA; CHRIS CALHOUN

v.

TOWNSHIP OF SPRINGFIELD; JAMES LEE, in his official capacity; SUSANNA O.
RATSAVONG, in her individual capacity; PETER D. WILSON, in his individual
capacity; BAIRD M. STANDISH, in his individual capacity; MICHAEL MAXWELL, in
his individual capacity; JONATHAN C. COBB, in his individual capacity; BRENDAN
MAY,
                                    Appellants
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2:23-cv-00332)
District Judge: Honorable Karen S. Marston
_____

Submitted pursuant to Circuit L.A.R. 34.1(a)
September 30, 2024
_____

Before: SHWARTZ, MATEY, and SCIRICA, *Circuit Judges*

(Filed January 28, 2025)
_____

OPINION[*]
_____

---

[*]This disposition is not an opinion of the full Court and, pursuant to I.O.P. 5.7,
does not constitute binding precedent.

MATEY, *Circuit Judge*.

A tempest in a teapot brewed when the Township of Springfield passed a policy forbidding Township employees from displaying a variation of the American flag supporting law enforcement officers. Because that policy violated the First Amendment, we will affirm the District Court's judgment.

**I.**

Christian Wilbur, Robert Baiada, and Chris Calhoun are police officers employed by the Township and are members of the Springfield Township Police Benevolent Association ("the PBA"). Calhoun is also a member of the Fraternal Order of Police Pennsylvania Lodge. The "Thin Blue Line American Flag" ("the Flag") is "a black and white American flag." Supp. App. 404. "All of the horizontal stripes are black and white with the exception of one horizontal stripe that is blue." Supp. App. 404. For Plaintiffs it "represents a show of support for [and] a solidarity with member[s] of law enforcement, which includes, police officers." Supp. App. 404. In March 2020, the PBA incorporated the Flag into its logo, which it uses at fundraisers, some of which occur on Township property. Individual Plaintiffs wish to continue to display the Flag on both personal and Township property. And the PBA wants to continue hosting events on Township property, displaying its logo and the Flag.

In 2021, Township Commissioners met with the PBA and asked them to remove the Flag from their logo. The PBA declined, and in response, the Township passed Resolution No. 1592 "prohibit[ing] the publicly visible display or use of any image which

2

depicts the Thin Blue Line American Flag symbol by any Township employee, agent or

consultant." Supp. App. 18. The Resolution contains three specific prohibitions:

1) The publicly visible depiction of the symbol on the clothing or skin of any Township employee, agent[,] or consultant while on duty, during the workday of the individual or while representing the Township in any way (specifically including the off duty time of any such individual if still wearing the Township uniform).

2) The publicly visible depiction of the Thin Blue Line American [F]lag symbol on any personal property of a [T]ownship employee, agent[,] or consultant, which is brought into the [T]ownship building (except prior to or subsequent to reporting for duty or any official assignment for the Township), and which, in the reasonable opinion of the Township Manager, is placed in a location likely to be seen by a member of the public while visiting the [T]ownship building.

3) The display, by installation or affixation of a publicly visible depiction of the symbol, on [T]ownship owned property (including [T]ownship vehicles), by any person.

Supp. App. 18–19.

Not content to rest with this non-binding statement of disapproval, the Township

Manager issued a Memorandum on January 16, 2023, making the Resolution "effective

immediately." Supp. App. 20. Plaintiffs then sued the Township under 42 U.S.C. § 1983

alleging that the Township's threatened enforcement of the Resolution violated the First

3

Amendment. The District Court granted Plaintiffs' motion for summary judgment[1] and entered a permanent injunction against further enforcement of the Resolution.[2]

## II.

The First Amendment protects the free speech of government employees when they speak "'as citizens' rather than 'pursuant to their official duties,'" *Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty.*, 39 F.4th 95, 103 (3d Cir. 2022) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006)), as long as their speech regards "'matters of public concern' rather than mere 'personal interest,'" *id.* (quoting *Borden v. Sch. Dist. of Twp. of E. Brunswick*, 523 F.3d 153, 168 (3d Cir. 2008)). "Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (citations and quotation marks omitted).

---

[1] During discovery, Defendants sought internal communications among PBA members related to the incorporation of the Flag into the PBA's logo, the enactment of the Resolution, and the decision to sue Defendants. The District Court concluded that the associational privilege applied, and the Township failed to show a substantial need for the requested information. *See NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958). We need not determine the scope of the associational privilege as "[a]n erroneous evidentiary ruling will be considered harmless if 'it is highly probable that the district court's [ruling] did not affect [the party's] substantial rights.'" *Great Am. Ins. v. Norwin Sch. Dist.*, 544 F.3d 229, 251 (3d Cir. 2008) (alteration in original) (quoting *Becker v. ARCO Chem. Co.*, 207 F.3d 176, 179 (3d Cir. 2000)). Because the discovery sought would not matter to the threshold question of whether Plaintiffs intended to speak as private citizens on a matter of public concern, it is highly likely that the ruling did not affect Defendants' substantial rights. *See id.*

[2] The District Court had jurisdiction under 28 U.S.C. § 1331, and we have jurisdiction under 28 U.S.C. § 1291. Our review is plenary. *Ellis v. Westinghouse Elec. Co.*, 11 F.4th 221, 229 (3d Cir. 2021).

4

But an employee's right to speak on matters of public concern is not unlimited.

We must "balance . . . the interests of the [employee], as a citizen, in commenting upon

matters of public concern and the interest of the State, as an employer, in promoting the

efficiency of the public services it performs through its employees." *Pickering v. Bd. of

Ed.*, 391 U.S. 563, 568 (1968). That balance "depends on whether the employer imposed

a prior restraint on speech or disciplined an employee after the fact." *Amalgamated

Transit*, 39 F.4th at 104. Because when an employer imposes a prior restraint, "the

Government's burden is greater . . . than with respect to an isolated disciplinary action."

*United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 468 (1995). So, we "must

consider not just the specific speech that concerned the government, but [also] the 'broad

range of present and future expression' that the rule chills and the interests of present and

future speakers and audiences." *Amalgamated Transit*, 39 F.4th at 104 (quoting *NTEU*,

513 U.S. at 468).[3]

## B.

Defendants concede that Plaintiffs are speaking as private citizens but argue that

Plaintiffs' speech is not a matter of public concern. But we previously rejected that

argument because speech concerning "'Black Lives Matter,' '*Thin Blue Line*,' and anti-

mask-mandate masks," comments on political or social concerns of the community.

*Amalgamated Transit*, 39 F.4th at 103–04 (emphasis added). Just as wearing masks

---

[3] Defendants do not dispute that the individual plaintiffs have standing. We agree. Accordingly, we need not decide whether the organizational plaintiffs have independent standing. *See Biden v. Nebraska*, 143 S. Ct. 2355, 2365 (2023) ("If at least one plaintiff has standing, the suit may proceed.").

supporting Black Lives Matter qualifies as speech on matters of public concern, *id.*, so too does the Flag in question here.

Because the Resolution and enforcement Memorandum constitute "a policy that prohibit[s] or restrain[s] future speech," *id.* at 104, we must consider "all present and future expression that the rule may chill," *id.* at 105. The Township also "bears the burden of showing" that the restricted expression's "'necessary impact on the actual operation of the Government' outweighs that interest." *Id.* (quoting *NTEU*, 513 U.S. at 468). This showing consists of two subparts: "first, that [Defendants] ha[ve] [identified] 'real, not merely conjectural' harms; and second, that the ban as applied . . . addresses these harms in a 'direct and material way.'" *Id.* (alterations in original) (quoting *Lodge No. 5 of Fraternal Ord. of Police ex rel. McNesby v. City of Philadelphia*, 763 F.3d 358, 370 (3d Cir. 2014)).

"To demonstrate 'real, not merely conjectural' harms, a government must not only identify legitimate interests, but also provide evidence that those concerns exist." *Fraternal Ord. of Police*, 763 F.3d at 370 (quoting *NTEU*, 513 U.S. at 472). "The government need not show the existence of actual disruption if it establishes that disruption is likely to occur because of the speech." *Munroe v. Cent. Bucks Sch. Dist.*, 805 F.3d 454, 472 (3d. Cir. 2015).

The Township has not met its burden. It concedes that it "cannot identify any specific incidents of disruptions" caused by Plaintiffs' use of the Flag. Supp. App. 415. Instead, it points to a 2021 study on policing, which found that African American residents are less likely to cooperate with, and have lower trust in, the Springfield Police

6

Department.[4] But that study was unrelated to the PBA's logo and its display of the Flag. Thus, it cannot support an inference "that disruption is likely to occur because of the speech." *Munroe*, 805 F.3d at 472. The Township also points to a few complaints from residents who felt that the Flag was offensive. But the Township Manager testified that he was aware of no disruption of services caused by the display of the Flag. And a handful of gripes and grumbles does not resemble "serious disruption caused by protests and riots" impacting public services. *Amalgamated Transit*, 39 F.4th at 105.

Moreover, the Resolution is not "narrowly tailored to the 'real, not merely conjectural' harm the Township identified." *Id.* (quoting *Fraternal Ord. of Police*, 763 F.3d at 370). The Resolution applies to "any Township employee, agent[,] or consultant," not just the Police Department. Supp. App. 18. But the Township offers no explanation for how restricting the expression of all employees will increase public trust in the Police Department. And, confusingly, although the Resolution "prohibit[s] the publicly visible display or use of any image that depicts the Thin Blue Line American Flag," Supp. App. 18, the Township concedes that the Resolution permits the display of the "Thin Blue Line Flag" lacking elements of the American flag. That only highlights the underinclusive nature of the restraint, and casts deep doubt on the Township's reasoning.

---

[4] The District Court also correctly ruled that the anonymous responses in the study are double hearsay, *see* Fed. R. Evid. 805, and that the Township "ha[d] not shown that *the residents' statements to researchers* are also admissible under a hearsay exception or exclusion." App. 73 (emphasis in original); *see Smith v. City of Allentown*, 589 F.3d 684, 693 (3d Cir. 2009) (requiring that hearsay within hearsay is excluded unless it conforms to an exception to the rule against hearsay).

After all, the ban only proscribes the viewpoint the Flag conveys, while giving opposing opinions free rein.

As the District Court observed, "nothing in the Resolution precludes an officer, while on duty and in uniform, from voicing opposition to the Black Lives Matter movement or for example, carrying a coffee cup that says, 'Blue Lives Matter.'" App. 93. Such "speech has the same, if not more, potential to cause disruption." *Amalgamated Transit*, 39 F.4th at 106. Accordingly, this over- and underinclusive policy fails to address the alleged harm "in a 'direct and material way.'" *Fraternal Ord. of Police*, 763 F.3d at 370 (quoting *NTEU*, 513 U.S. at 475).[5]

\* \* \*

For these reasons we will affirm the District Court's order.

---

[5] Because the Resolution fails *NTEU* balancing we need not address whether the Resolution is also unconstitutionally vague or overbroad.

8

SHWARTZ, <u>Circuit Judge</u>, dissenting.

Under the Resolution and accompanying Memorandum,[1] the Township prohibited its employees from displaying the "Thin Blue Line American Flag" ("TBLAF") in limited circumstances.  To some, the TBLAF represents police solidarity.  To others, it communicates a white supremacist message, which could erode public trust in the police.  When public confidence in law enforcement declines, public safety suffers.  As a result,

_____

[1] My colleagues quote the Resolution.  Below is the relevant language from the Memorandum, which identifies what the Resolution "specifically prohibits":

> 1.  The publicly visible depiction of the symbol on the clothing or skin of any township employee, agent or consultant while on duty, during the workday of the individual, or while representing the township in any way.
>
> 2.  The publicly visible depiction of the symbol on any personal property of an employee, agent or consultant which is brought into a township building and is likely to be seen by a member of the public.[]
>
> 3.  The display, by installation or affixation, of a publicly visible depiction of the symbol on township-owned property by any person.

App. 1258.  The Memorandum also provides:

> Personal items that are brought into a township-owned building but are not publicly visible are permitted, as well as depictions of the symbol on personal clothing that may be worn by an employee while reporting to and from work[.]
>
> To the extent that any employee has any personal property with the symbol on it, and that property is located in such a place where it is likely to be seen by a member of the public, kindly remove it from the premises, or relocate it to a place where it is not likely to be seen by a member of the public while visiting a township building.

<u>Id</u>. (emphasis omitted).

1

viewing the facts and drawing inferences in the Defendants' favor, a reasonable jury could conclude that the Township's interest—in preventing the erosion of public trust in law enforcement by restricting the display of a symbol associated by some with white supremacy—outweighs the rights of the Fraternal Order of Police and police officers, to display the TBLAF in certain circumstances.[2]  As a result, I conclude that the District Court erred in granting Plaintiffs' motion for summary judgment.  Therefore, I respectfully dissent.

I

The enumerations within the Resolution and Memorandum set forth the complete list of prohibited conduct.  The enumerations' plain language is "clear and as reasonably limited as possible," App. 1255, and shows the Township's intent to prohibit only narrow categories of conduct.[3, 4]  Moreover, to construe the Resolution broadly would contravene

---

[2] I offer no opinion on the actual meaning of the TBLAF or the intent of the Township's police officers who choose to display it.  Rather, I reach this conclusion mindful of our duty to construe facts and draw inferences in the nonmovant's (here, Defendants') favor.  See Hugh v. Butler Cnty. Fam. YMCA, 418 F.3d 265, 267 (3d Cir. 2005).

[3] The first enumeration prevents employees from wearing the TBLAF while on duty or representing the Township, and "specifically includ[es] the off duty time of any [] individual if still wearing the Township uniform."  App. 1255.  Similarly, the second enumeration specifically permits TBLAF displays "prior to or subsequent to reporting for duty."  App. 1256.  These clarifications would be unnecessary if the Resolution prohibited employees from displaying the TLBAF in all circumstances.

[4] Plaintiffs' challenges to the Resolution on vagueness and overbreadth grounds fail.  The Resolution is not unconstitutionally vague because (1) as to whom it applies, the Resolution only applies to "Township employee[s], agent[s] or consultant[s]," with the only exception being that it also applies to any person who "install[s] or affix[es]" the TBLAF on Township-owned property, see Grayned v. City of Rockford, 408 U.S. 104, 110 (1972) (looking to "what the ordinance as a whole prohibits" and neither expecting nor requiring "mathematical certainty"); (2) as to where the Resolution applies, each

2

the Supreme Court's instruction that we read a locality's enactments in ways that do not give rise to constitutional problems. See Frisby v. Schultz, 487 U.S. 474, 483 (1988) ("To the extent they endorsed a broad reading of the ordinance, the lower courts ran afoul of the well-established principle that statutes will be interpreted to avoid constitutional difficulties.").[5] Therefore, the question before us is the constitutionality of the three enumerated prohibitions.

## II

Because we are examining a government's ex ante speech restriction, we apply United States v. National Treasurers Employees Union, 513 U.S. 454 (1995) ("NTEU"). Under NTEU, to justify an ex ante restriction, the government must show that (1) the "expression's 'necessary impact on the actual operation' of the [g]overnment" outweighs "the interests of both potential audiences and a vast group of present and future

enumerated prohibition delineates where that restriction applies; (3) as to what is prohibited, the speech restrictions identify the speech at issue; and (4) as to when it applies, it applies only when officers are on-duty, or off-duty but wearing their uniform or otherwise representing the Township, and Plaintiffs' arguments based on certain officers' purported perceptions that they are always representing the Township is "speculation about possible vagueness in hypothetical situations not before the Court [that] will not support a facial attack on a statute," Hill v. Colorado, 530 U.S. 703, 733 (2000). Accordingly, the Resolution is not void for vagueness.

Plaintiffs' overbreadth challenge fails too because it rests on their mistaken interpretation that the Resolution is broadly applicable and not limited by its exhaustive enumerations. When limited to its enumerations, the Resolution is not unconstitutionally overbroad.

[5] See also Free Enter. Fund v. Pub. Co. Acct. Oversight Bd., 561 U.S. 477, 508 (2010) (holding that, where a statute contains constitutional flaws, "we try to limit the solution to the problem, severing any problematic portions while leaving the remainder intact" (internal quotation marks omitted)); Seila L. LLC v. CFPB, 591 U.S. 197, 237 (2020) (advising courts to "use a scalpel rather than a bulldozer" to cure a statute's constitutional defects).

employees in a broad range of present and future expression," id. at 468 (quoting

Pickering v. Bd. of Educ., 391 U.S. 563, 571 (1968)); and (2) "the recited harms are real,

not merely conjectural, and that the regulation will in fact alleviate these harms in a direct

and material way," id. at 475 (quoting Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 664

(1994)).

The need for the harm to be "real, not merely conjectural" does not require the

government to point to an actual, specific, and already-transpired harm.  Id.  Rather, there

must be a "reasonable ground to fear" that harm will arise if the speech at issue is not

restrained.  NTEU, 513 U.S. at 475 (citation omitted).  As Justice O'Connor emphasized,

the government needs "to make a substantial showing that the speech is, in fact, likely to

be disruptive before it may be punished."  Id. at 483 (O'Connor, J., concurring in the

judgment in part and dissenting in part) (quoting Waters v. Churchill, 511 U.S. 661, 674

(1994)).

The Township has the burden of showing "real, not merely conjectural harms,"

Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty., 39 F.4th 95, 105

(3d Cir. 2022) (internal quotation marks omitted), and it has identified genuine disputes

of material fact that, resolved in its favor, would do precisely that.  Plaintiffs concede that

(1) some residents view the TBLAF as a racist, white supremacist hate symbol,[6] and (2)

---

[6] See App. 917 (Calhoun agreeing that the TBLAF "could be a hate symbol to some people"); App. 1051 (Wilbur conceding that he reviewed news articles that "indicate[d] that some people viewed [the TBLAF] as racist"); see also App. 433 (Wilbur stating he was aware that two residents complained at the Community Day that the PBA's logo, which features the TBLAF, was racist); App. 439 (Wilbur acknowledging that he read news articles conveying that some people viewed the TBLAF symbol as racist);

4

when public trust in the police is eroded, communities are less safe, which is why public trust in the police is an important consideration for local governments.[7] The Majority discounts these concerns, noting that too "few" residents "felt that the [TBLAF] was offensive" and that there were no identified disruptions caused by displaying the TBLAF. Op. at 7. However, as the Majority agrees, the "government need not show the existence of actual disruption," and here, the residents' concerns[8] raise an inference, which we must

App. 343 (Wilbur agreeing that white nationalists carrying the TBLAF could send the message that the flag is associated with that ideology); App. 647 (Taylor stating, as the Township's 30(b)(6) deponent, that the Township became aware in 2021 that the TBLAF represented "opposition to the racial justice movement" and was in some instances "a symbol of white supremacy"); App. 862-63 (Calhoun acknowledging that some view the TBLAF logo as a white supremacist symbol, and that he was told as much by the Township); App. 874-76, 878 (Calhoun acknowledging residents testified at public Board hearings that the TBLAF was racist and a white supremacist symbol, and that they supported the Resolution and opposed the PBA logo); App. 878-79 (Calhoun acknowledging that people feel differently about the TBLAF and that it concerns him that residents view the flag as racist, but that their belief is not, in his view, correct); App. 1302-03, 1306 (Baiada acknowledging that the Board room was full for the Resolution's public comment period, and that residents testified in favor of the Resolution and believed the TBLAF was racist). Additionally, Calhoun's and Baida's declarations, which aver that the disclosure of their internal communications will chill their speech, cite residents' views about the TBLAF being racist and a hate symbol and compare it to the confederate flag and swastika. See App. 288-90 (Calhoun Decl.); App. 294-96 (Baida Decl.).

[7] See App. 980-81 (FOP President agreeing that (1) "it is paramount that the public trusts its police departments"; (2) when people do not trust the police, they are less likely to report crime and cooperate in police investigations; and (3) when crime reports and civilian cooperation decrease, it results in "more crime" and is "negative to all of society").

[8] Several residents characterized the TBLAF as (1) "insidious," associated with "white supremacist[s]" and "racist movements" which "goes against [the police] building relationships with [] community members," App. 1174; (2) "profoundly racist," App. 1176; (3) a symbol "used by racists and insurrectionists" that "denigrates the lives and values" of residents, App. 1187; (4) "evok[ing] a sense of mistrust," App. 1188; (5) "a symbol of white supremacy" that "conveys hostility to and calls into question the equality and dignity of all residents," App. 1191; (6) "a symbol of hatred and bigotry" and

5

view in their favor, "that disruption is likely to occur." Munroe v. Cent. Bucks Sch. Dist., 805 F.3d 454, 472 (3d. Cir. 2015).

Accordingly, viewing the facts and drawing inferences in Defendants' favor, a reasonable jury could determine that (1) some residents interpret the symbol as hateful; (2) law enforcement's embrace of a hateful symbol on officers' clothing in the Township building, or affixed to Township property, erodes residents' trust in the police; and (3) the erosion of trust undermines public safety by making it less likely for people to report crime and otherwise cooperate with the police. Therefore, for summary judgment purposes, the government has satisfied its burden of showing that Defendants' desire to engage in the speech at issue is outweighed by the "impact [of the speech] on the actual operation of the [g]overnment."[9] NTEU, 513 U.S. at 468 (internal quotation marks omitted).[10]

_____

"offensive to many citizens," App. 1195; (7) "openly racist," App. 1196; (8) a "hurtful" symbol that "doesn't promote community unity," App. 1202; (9) "caus[ing] further division and controversy," App. 1206; and (10) having been "adopt[ed] by white supremacist and fascist groups" and representative of "dog-whistle symbolism," App. 1222.

[9] Cf. Birchfield v. North Dakota, 579 U.S. 438, 464 (2016) (characterizing public safety to be a "paramount interest" of the government (internal quotation marks omitted)); Craig v. Boren, 429 U.S. 190, 199-200 (1976) ("Clearly, the protection of public health and safety represents an important function of state and local governments."); Harris v. City of Philadelphia, 47 F.3d 1342, 1358-59 (3d Cir. 1995) (Alito, J., concurring in part and dissenting in part) ("One of the most basic and important responsibilities of a municipal government is to protect the safety of its people.").

[10] Furthermore, the officers may communicate the same message they seek to profess (i.e., support for law enforcement) via a different symbol that (1) does not convey a racist message, (2) does not undermine the government's interest in fostering community trust in the police, and (3) protects officers' purported reasons for displaying the TBLAF. See App. 959 (FOP President conceding that the "Thin Blue Line" flag, which is different than the TBLAF, has "exactly the same meaning" as the TBLAF with

6

Viewing the facts and drawing inferences in Defendants' favor, the Resolution's three speech restrictions "address[] these harms in a direct and material way." Amalgamated Transit, 39 F.4th at 105 (internal quotation marks omitted).

As to the first enumerated prohibition, the facts viewed in Defendants' favor provide a basis to infer that police officers' public display of the TBLAF on their clothing or skin, while on duty, working, or representing the Township, communicates support for white supremacy in the eyes of some community members.[11]  Therefore, prohibiting officers from displaying the TBLAF is a "direct and material way" of preventing such a perception, maintaining community confidence in the police, and enhancing public safety.  NTEU, 513 U.S. at 475.

As to the second enumerated prohibition, it is similarly reasonable to infer from the record that publicly visible depictions of the TBLAF on personal property located on

---

respect to support for law enforcement); Gasparinetti v. Kerr, 568 F.2d 311, 315-16 (3d Cir. 1977) (recognizing "a significant government interest in regulating some speech of police officers in order to . . . instill public confidence in the law enforcement institution"); see also Hernandez v. City of Phoenix, 43 F.4th 966, 978 (9th Cir. 2022) (holding, in a case examining a police officer's speech, that "[s]peech that expresses hostility toward racial or religious minorities may be of particularly low First Amendment value").

[11] The Majority claims that the Resolution's application to "any Township employee, agent[,] or consultant," App. 1255, indicates that it is not narrowly tailored to the identified harm.  I do not think this is a concern in this case.  Police officers and the FOP are the only parties challenging the Resolution and Memorandum here and we therefore need not reach the Resolution and Memorandum's application to other employees or groups.  Even if we did, the public could infer that an employee's speech through his or her display of the TBLAF demonstrates the Township's endorsement of the message that some think the TBLAF conveys.

Township property would communicate the Township's endorsement of the TBLAF and what some believe it symbolizes. Therefore, prohibiting such displays would bolster confidence in the local government, thereby promoting public safety in a "direct and material way." Id. Moreover, the prohibition applies to only publicly accessible spaces in the Township building and therefore does not regulate all displays of the TBLAF on personal property located on Township property. Additionally, because most of the police department is almost always inaccessible to the public, the limitation on officers' First Amendment rights is minimal.

Finally, the third enumerated prohibition demonstrates that the Resolution's prohibition of the TBLAF is narrow because it (1) only applies to Township property, and (2) "direct[ly] and material[ly]" addresses the harm to public safety which would flow from a perception that the presence of the TBLAF on Township property could be understood as demonstrating support for white supremacy. Id.

Therefore, construing facts and drawing inferences in Defendants' favor, a reasonable jury could find "reasonable ground" to fear that officers' public display of the TBLAF would erode community trust in the police and that this would undermine public safety. Accordingly, such a jury could find that the Resolution and Memorandum are "reasonable response[s] to the posited harms." Id. at 475-76.

IV

For the foregoing reasons, I respectfully dissent.

8