**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 24-1443
_____

ERIE INDEMNITY COMPANY

v.

TROY STEPHENSON; CHRISTINA STEPHENSON, and
STEVEN BARNETT, in both their individual capacities and
in any representative capacities they may have relating to
ERIE INSURANCE EXCHANGE,
                              Appellants
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 1:22-cv-00093)
Magistrate Judge:  Honorable Cynthia R. Eddy
_____

Argued:  October 29, 2024

Before:  HARDIMAN, PHIPPS, and FREEMAN,
*Circuit Judges*

(Filed: October 14, 2025)

Kevin J. Abramowicz
Kayla M. Conahan
Stephanie Moore
Helen C. Steiger
Kevin W. Tucker
EAST END TRIAL GROUP
6901 Lynn Way
Suite 503
Pittsburgh, PA 15208

Edwin J. Kilpela, Jr.
WADE KILPELA SLADE
6425 Living Place
Suite 200
Pittsburgh, PA 15206

Nicolas Sansone          **[ARGUED]**
PUBLIC CITIZEN LITIGATION GROUP
1600 20th Street NW
Washington, DC 20009

        *Counsel for Appellants*

Neal R. Devlin
KNOX MCLAUGHLIN GORNALL & SENNETT
120 W Tenth Street
Erie, PA 16501

2

Steven B. Feirson
Brian A. Kulp
Michael H. McGinley          **[ARGUED]**
Clare P. Pozos
DECHERT
2929 Arch Street
18th Floor, Cira Centre
Philadelphia, PA 19104

     *Counsel for Appellee*

_____

OPINION OF THE COURT
_____

**PHIPPS**, *Circuit Judge*.

The legal doctrines of *res judicata* and collateral estoppel preclude the relitigation of claims and issues, respectively. In this case, the entity managing a reciprocal insurance exchange sought to enjoin insurance policyholders from litigating breach-of-fiduciary-duty claims in state court based on prior federal-court judgments that it argued had both claim and issue preclusive effect. The District Court determined that claim preclusion applied, and then, relying on the All Writs Act and the relitigation exception to the Anti-Injunction Act, it entered a preliminary injunction preventing the policyholders from proceeding with their state-court litigation. In this appeal, the policyholders challenge that order. Because the prior federal-court judgments do not have either claim or issue preclusive effect, we will vacate the preliminary injunction order and remand this case to the District Court.

3

## I.  FACTUAL BACKGROUND & PROCEDURAL HISTORY

### A. Reciprocal Insurance in Pennsylvania

The origin of reciprocal insurance can be traced to a group of six dry goods merchants in New York City, who, in 1881, began insuring one another against the risk of fire.[1] From that arrangement, a key feature of reciprocal insurance emerged: every insured is an insurer, and every insurer is an insured.[2] To operationalize this arrangement in which insurers do not seek to profit by insuring one another,[3] the insureds, referred to as

---

[1] *See* Dennis F. Reinmuth, *The Regulation of Reciprocal Insurance Exchanges* 1–2 (1967).

[2] *See* Robert J. Brennen, *Inter-Insurance – Its Legal Aspects and Business Possibilities*, 58 Cent. L.J. 323, 325 (1904) ("In Lloyds insurance there are underwriters[,] all of whom are insurers, but not necessarily policy-holders, while in inter-insurance all policy-holders are insurers and insured."); *see also Long v. Sakleson*, 195 A. 416, 418 (Pa. 1937) ("[T]he subscribers to an exchange are not merely underwriters, for they are themselves insured . . . ."); *Underwriters' Exch. v. Indianapolis St. Ry. Co.*, 185 N.E. 504, 506–07 (Ind. 1933) ("But the fact must not be overlooked that reciprocal or interinsurance contracts are distinguishable from all other forms of insurance, in that every insured is an interinsurer and every insurer is insured."); *cf. also* 3 *Couch on Insurance* § 39.48 (3d ed. June 2025 update) (identifying the material differences between reciprocal insurance and other types of insurance organizations such as Lloyds and mutual insurance).

[3] *See* Michael A. Haskel, *The Legal Relationship Among a Reciprocal Insurer's Subscribers, Advisory Committee and Attorney-In-Fact*, 6 CUNY L. Rev. 35, 40 (2003) ("The dual status of subscribers as insurers and insureds eliminates the layer of profit that would otherwise inure to the benefit of a separately owned insurer."); Richard Lima Norgaard, *Reciprocals: A Study of the Evolution of an Insurance Institution* 163 (1962) (Ph.D. dissertation, University of

'subscribers,'[4] form an 'exchange'[5] – not by mutual agreement among themselves but by individually assigning an identical, limited power of attorney to the same third party.[6] Through subscriber's agreements between the individual subscribers

Minnesota) (explaining that a reciprocal is "designed to spread the risk of insurable perils at the lowest possible cost").

[4] *See* Andrew Verstein, *Enterprise Without Entities*, 116 Mich. L. Rev. 247, 265 (2017) ("Owing to their dual role as both insured and insurer, the customers are usually called 'subscribers.'").

[5] *See Peace Church Risk Retention Grp. v. Johnson Controls Fire Prot. LP*, 49 F.4th 866, 871 (3d Cir. 2022) (explaining that the exchange formed by subscribers "is, in general, a distinct legal entity that can sue or be sued in its own name, but unlike traditional mutual insurance companies, has no corporate existence"); Verstein, *supra*, at 265 ("The term 'exchange' is used to refer to the physical or conceptual space in which subscribers' risks are swapped.").

[6] *See Long*, 195 A. at 418 (explaining that each subscriber "by power of attorney, authorizes the attorney in fact to represent him individually in exchanging insurance with others, and to do every act that he could do in relation to suits or other proceedings"); Norgaard, *supra*, at 39 ("Subscribers are distinctively individual in that they sign individual contracts with the attorney-in-fact, they are accounted for individually, their surplus is individually marked for them, and when one subscriber has a loss, every other subscriber has his proportionate share of that loss and the accompanying expense deducted from his deposit."); Verstein, *supra*, at 265 (explaining that the powers of the attorney-in-fact "are set by individual contracts with the subscribers"); Reinmuth, *supra*, at 12 ("The powers and duties of the attorney-in-fact are commonly contained in the subscriber's agreement . . . .").

and their common attorney-in-fact,[7] the subscribers authorize the attorney-in-fact to underwrite policies with the subscribers having liability for loss claims under those policies.[8]  With that authorization from every subscriber, the common attorney-in-fact then issues policies to subscribers on behalf of the exchange and performs other functions related to the insurance business such as collecting premiums and settling claims.[9]  The

---

[7] *See* Reinmuth, *supra*, at 16 ("Procedurally, the management of a reciprocal, that is, the attorney-in-fact, is appointed by each policyholder through the medium of the subscriber's agreement or power of attorney.").

[8] Typically, the subscribers limit their liability to separate and several liability – not joint liability – for loss claims under those policies.  *See Long*, 195 A. at 418 (explaining that reciprocal insurance was "[o]riginally designed as a means of enabling members of close-knit groups to insure each other without joint liability"); 3 *Couch on Insurance* § 39:56 (3d ed. June 2025 update) ("The liability of the subscribers is several . . . ."); *cf. Wysong v. Auto. Underwriters*, 184 N.E. 783, 786 (Ind. 1933) ("The subscribers have the right to . . . fix the limit of their liability unless there is some law preventing it."); Verstein, *supra*, at 266 ("By the 1960s, reciprocals ordinarily limited liability to one additional premium deposit or less."). *But cf. Commonwealth ex rel. Schnader v. Keystone Indem. Exch.*, 11 A.2d 887, 891 (Pa. 1940) (allowing subscribers to be assessed up to the full amount of one additional annual premium to cover losses associated with liquidation).

[9] *See Long*, 195 A. at 418 ("Each member who is a subscriber, by power of attorney, authorizes the attorney in fact to represent him individually in exchanging insurance with others, and to do every act that he could do in relation to suits or other proceedings."); *William Penn Motor Indem. Exch. v. Haddad*, 86 Pa. Super. 307, 308–09 (1925) (explaining under the Act of June 27, 1913, No. 372, 1913 Pa. Laws 634, "[a]s it would be obviously impracticable for each member of the large group of subscribers personally to attend to the details essential

attorney-in-fact receives compensation for performing those services by individual consent of each subscriber, provided by his or her subscriber's agreement.[10]  In practice, the compensation for the attorney-in-fact is a percentage of the premiums from policies issued by the exchange, not a pledge of the surplus from the insurance business – any surplus is shared among the subscribers.[11]  By way of simplified example:

> [If A, B, and C, are all subscribers, then] A and B separately and severally undertake to indemnify C; B and C separately and severally undertake to indemnify A[;] and A and C separately and severally undertake to indemnify B.  They proceed by appointing D their attorney

to the performance of what was authorized by the statute, it provided that the reciprocal or inter-insurance contract with each other might be executed for the subscriber, and that other things might be done on his behalf, by an attorney, agent, or other representative, who was designated attorney"); Reinmuth, *supra*, at 12 ("In effect the attorney-in-fact is the management of the reciprocal.").

[10] *See* 3 *Couch on Insurance* § 39:55 (3d ed. June 2025 update) ("The subscribers contribute premiums or membership fees that are deposited by the attorney-in-fact for the association to meet expenses and obligations including the compensation of the attorney-in-fact."); *see also* Reinmuth, *supra*, at 12 ("Perhaps the most important aspects regarding the attorney-in-fact involve its structure and compensation.").

[11] *See* 43 Am. Jur. 2d *Insurance* § 74 (May 2025 update) ("Generally speaking, the subscribers to a reciprocal or interinsurance association pay a premium or membership fee to the exchange, and from the premiums, a fixed percentage is deducted as the fee of the attorney-in-fact."). *But cf.* Norgaard, *supra*, at 30 ("In the reciprocal, the surplus is owned by those who have contributed it . . . .").

> in fact for that particular purpose and business, and he takes the place of an insurance company in every particular.  The power of attorney . . . limits D's rights and powers, and prescribes his duties and provides for his compensation.

Robert J. Brennen, *Inter-Insurance – Its Legal Aspects and Business Possibilities*, 58 Cent. L.J. 323, 323 (1904).[12]

In 1913, based on model legislation proposed by the National Convention of Insurance Commissioners, Pennsylvania became the first state to provide an express statutory authorization for reciprocal insurance for all forms of insurance except life insurance.[13]  Pennsylvania's subsequent

---

[12] *See generally* Haskel, *supra*, at 35–37 (providing a description of reciprocal insurance); Norgaard, *supra*, at 25–39, 190 (identifying the five attributes of reciprocal insurance as individual subscribers, the exchange, the attorney-in-fact, the division of surplus, and separate-and-several liability).

[13] *Compare* Act of June 27, 1913, No. 372, 1913 Pa. Laws 634, *with* Reinmuth, *supra*, at App. A.  *See also* Reinmuth, *supra*, at 50–52 (describing the circumstances leading up to the promulgation of the model law); Verstein, *supra*, at 267 & n.108 (explaining that the first statute that "specifically addressed reciprocals" was enacted in 1913 in Pennsylvania); *Long*, 195 A. at 418–19 (recounting that Pennsylvania first provided for the operation of reciprocal insurance by legislation in 1913); *cf. Haddad*, 86 Pa. Super. at 308–09 (explaining that the 1913 Act "provided that the reciprocal or inter-insurance contract with each other might be executed for the subscriber, and that other things might be done on his behalf, by an attorney, agent, or other representative, who was designated attorney"); *In re Minnesota Ins. Underwriters*, 36 F.2d 371, 372 (D. Minn. 1929) ("It is a well-known fact that reciprocal or interinsurance exchanges existed in this country prior to enactment of laws authorizing them.").

Insurance Company Law of 1921[14] repealed that legislation,[15] but it substantially reenacted the authorization for reciprocal insurance.[16]

### B. The Founding, Structure, and Operation of Erie Insurance Group

In 1925, H.O. Hirt founded the Erie Insurance Group, a Pennsylvania insurance holding company, to provide reciprocal insurance. Erie Insurance Group consists of an unincorporated association of subscribers, Erie Insurance Exchange, and their attorney-in-fact, Erie Indemnity Company, which is a publicly traded Pennsylvania corporation with a principal place of business in Erie, Pennsylvania. Each subscriber in the Exchange has individually appointed Indemnity as his or her attorney-in-fact through a substantively identical subscriber's agreement. In addition to conferring specific powers to Indemnity related to managing the business

---

[14] Insurance Company Law of 1921, Pub. L. No. 682, art. X, § 1001 (1921) (currently codified at 40 Pa. Stat. § 961).

[15] *See Long*, 195 A. at 419.

[16] In later providing statutory authorizations for reciprocal insurance, some other states have required a subscribers' committee to represent the exchange, and potentially to have the authority to regulate the compensation of the attorney-in-fact. *See, e.g.*, N.Y. Ins. Law §§ 6101–06 (requiring a subscribers' committee elected annually by subscribers with the power to manage the reciprocal insurer); Cal. Ins. Code § 1308 (requiring a subscribers' committee but not conferring power to set the compensation for the attorney-in-fact); *cf.* Reinmuth, *supra*, at 16 ("In many instances the subscribers' committee can be described merely as 'window dressing.' Few states require[d] by statute a subscribers' committee and, of those that d[id], most d[id] not stipulate that it be elected by the subscribers."). Pennsylvania does not statutorily require a subscribers' committee for reciprocal insurance.

and affairs of the Exchange, the Subscriber's Agreement allows Indemnity to "retain up to 25% of all premiums" as compensation, referred to as the 'management fee.' Subscriber's Agreement ¶ 3 (JA183).

Although Indemnity may set its own compensation, subject to the 25%-of-premiums cap for the management fee, the amount that it set for itself was not historically a point of conflict. During Hirt's tenure as Chief Executive Officer and President of Indemnity until 1976 and as one of its Directors until 1980, there appears to have been no litigation over the amount of the management fee. Likewise, in the years immediately following Hirt's departure and his later passing in 1982, which led to the transfer of voting control of Indemnity to his descendants, it does not appear that any subscriber sued Indemnity over the percentage of the management fee that Indemnity charged.

Beginning in 1991, Indemnity's Board of Directors voted for the first time to retain the maximum 25% of premiums for its compensation. *See* Erie Indemnity Co., Annual Report 18 (Form 10-K) (Mar. 26, 1998); *cf. Vanderklok v. United States*, 868 F.3d 189, 205 n.16 (3d Cir. 2017) (explaining that a court may take judicial notice of "information [that] is publicly available on government websites"). Over the course of the next two decades, the Board voted at its annual December meeting to retain no less than 23.5% of the premiums, and since 2006, the Board has voted annually to retain 25% of the premiums as compensation for Indemnity's services.

Around the same time, there was a change in practice with respect to other subscribers' fees. One of those fees related to installment plans. *See Beltz v. Erie Indem. Co.*, 733 F. App'x 595, 597 (3d Cir. 2018). For a fee, subscribers could pay their premiums in installments, and before 1997, those fees were treated as ordinary revenue of the Exchange for the benefit of subscribers. *Id.* But in 1997, Indemnity started retaining a

10

portion of those fees. *Id.* And, within two years, Indemnity began keeping all installment-plan fees for itself. *Id.* at 598.

In 2008, Indemnity started charging subscribers additional fees for late premium payments, cancellation notices, and reinstatement costs. *See id.* As with the installment-plan fees, Indemnity retained those fees, collectively referred to herein as 'late fees,' instead of treating them as revenue for the benefit of the subscribers. *See id.*

### C. Suits by Subscribers Against Indemnity Based on Fee Retention

Indemnity's changes to its fee practices prompted lawsuits by subscribers. Three of those are relevant here: the *Beltz* litigation, the *Ritz* case, and the *Stephenson* cases.[17]

### 1. *The* Beltz *Litigation*

In the *Beltz* case that commenced in July 2016,[18] subscribers sued Indemnity in the United States District Court

---

[17] There have been several other challenges by subscribers to Indemnity's retention of fees. *See, e.g.*, *Erie Ins. Exch. v. Erie Indem. Co.*, No. GD-12-1712 (Pa. Ct. C.P. Fayette); *Erie Ins. Exch. v. Erie Indem. Co.*, No. MS14-03-003 (Pa. Ins. Comm'r Apr. 29, 2015); *Erie Ins. Exch. ex rel. Sullivan v. Erie Indem. Co.*, 2012 WL 4762203 (W.D. Pa. Oct. 5, 2012), *aff'd sub nom. Erie Ins. Exch. v. Erie Indem. Co.*, 722 F.3d 154 (3d Cir. 2013); *Erie Ins. Exch. by Beltz v. Stover*, 2014 WL 546707 (W.D. Pa. Feb. 10, 2014), *appeal dismissed sub nom.*, *Erie Ins. Exch. ex rel. Beltz v. Stover*, 619 F. App'x 118 (3d Cir. 2015); *Erie Ins. Exch. ex rel. Sullivan v. Pa. Ins. Dep't*, 133 A.3d 102 (Pa. Commw. Ct. 2016).

[18] The *Beltz* plaintiffs previously sued Indemnity in 2012 in Pennsylvania state court for breach of contract and breach of fiduciary duty. *Beltz*, 279 F. Supp. 3d at 577 (citing *Erie Ins. Exch.*, No. GD-12-1712 (Pa. Ct. C.P. Fayette)). Indemnity removed the action to district court, citing the diversity

for the Western District of Pennsylvania for retaining installment-plan fees from 1997 to 2016 and late fees from 2008 to 2016. *See Beltz v. Erie Indem. Co.*, 279 F. Supp. 3d 569 (W.D. Pa. 2017), *aff'd*, 733 F. App'x 595 (3d Cir. 2018). Based on those allegations, the subscribers brought five claims under Pennsylvania law: two for breach of fiduciary duty and one count each for breach of contract, unjust enrichment, and conversion. To invoke the limited subject-matter jurisdiction of the district court, the subscribers sued primarily as putative class members and relied on the diversity provisions of the Class Action Fairness Act, commonly abbreviated as 'CAFA.' *See* 28 U.S.C. § 1332(d). But they also brought suit as individuals and derivatively on behalf of the Exchange, and to proceed with their claims in those capacities, they relied on supplemental jurisdiction. *See id.* § 1367(a).

Indemnity successfully moved to dismiss all of those claims. *Beltz*, 279 F. Supp. 3d at 585. In particular, the district court dismissed the breach-of-fiduciary-duty claims as untimely under the applicable two-year statute of limitations. *Id.* at 581–83 (citing 42 Pa. Cons. Stat. § 5524(7)). The district court reasoned that although Indemnity had been continuously retaining the installment plan fees since 1997 and the late fees since 2008, the claims for breaches of fiduciary duty related to Indemnity's decisions in 1997 and 2008 to retain those fees,

provisions of CAFA, *see* 28 U.S.C. § 1332(d), but, on the *Beltz* plaintiffs' motion, the district court determined that it lacked subject-matter jurisdiction and remanded the case to state court. *Sullivan*, 2012 WL 4762203, at \*1, \*4. This Court affirmed that ruling on the basis that plaintiffs had not pleaded a class action. *Sullivan*, 722 F.3d at 163. In state court, Indemnity lodged preliminary objections, one of which sought to refer the matter to the Pennsylvania Insurance Department based on primary jurisdiction and that objection was sustained. *Beltz*, 279 F. Supp. 3d at 577. The Department ruled in favor of Indemnity, but on appeal the Commonwealth Court vacated that ruling. *Sullivan*, 133 A.3d at 107, 112–13.

and thus claims filed in 2016 to challenge those decisions were untimely and not subject to a continuing-violation exception or to equitable tolling. *Id.*

On appeal, the subscribers unsuccessfully sought to resuscitate those claims. *Beltz*, 733 F. App'x at 598. In their appellate briefing, the subscribers advanced a failure-to-act theory based on inadequate oversight in an attempt to overcome the statute of limitations. But that argument was not presented in district court, and this Court relied on forfeiture principles to affirm the judgment of the district court. *Id.* at 599.

### 2. *The* Ritz *Litigation*

In December 2017, after the district court's dismissal of the *Beltz* suit but before resolution of the *Beltz* appeal, another subscriber, who was not a named party to the *Beltz* case, initiated the *Ritz* suit in the Western District of Pennsylvania against Indemnity. *Ritz v. Erie Indem. Co.*, 2019 WL 438086, at *1 (W.D. Pa. Feb. 4, 2019). That plaintiff sued Indemnity for two counts of breach of fiduciary duty, one count of breach of contract, and one count of unjust enrichment. That subscriber premised her claims not on the installment plan fees or the late fees, as the *Beltz* plaintiffs had done, but instead on the 25% management fee for the upcoming year that Indemnity set every December between 2006 to 2016. The plaintiff in *Ritz* followed the same approach to jurisdiction as the *Beltz* plaintiffs: she sued as a putative class member, relying on CAFA diversity jurisdiction, *see* 28 U.S.C. § 1332(d), and she also sued individually and derivatively on the Exchange's behalf, relying on supplemental jurisdiction, *see id.* § 1367(a).

After the parties in *Ritz* consented to the jurisdiction of a magistrate judge, *see id.* § 636(c)(1), Indemnity moved to dismiss the claims on claim-preclusion grounds. *Ritz*, 2019 WL 438086, at *1. The magistrate judge granted that motion and dismissed the case with prejudice. *Id.* at *6. The memorandum opinion in support of that ruling identified the

13

three elements of federal claim preclusion – a final judgment; a subsequent suit based on the same cause of action; and the involvement of the same parties or their privies in both suits – and determined that they were satisfied. *Id.* at *3–6. *See generally In re Mullarkey*, 536 F.3d 215, 225 (3d Cir. 2008). In particular, with respect to the requirement for the same cause of action, the magistrate judge concluded that the *Ritz* plaintiff was pursuing the same cause of action as the *Beltz* plaintiffs because her claims for charging the 25% management fee were part of the same transaction or occurrence as the *Beltz* action and could have been brought in that suit. *Ritz*, 2019 WL 438086, at *4–5; *id.* at *4 ("Both cases allege that this scheme began at the same time, that it breaches the same provision of an identical Subscriber's Agreement and allegedly caused damages to the same putative class."). And finally, the memorandum opinion concluded that although the *Ritz* plaintiff was not a party to the *Beltz* suit, she was in privity with the *Beltz* plaintiffs because they had entered into identical subscriber's agreements with Indemnity as "cosigners." *Id.* at *6.

Despite that adverse ruling and the privity holding based on the finding that subscribers were co-signers, the *Ritz* plaintiff did not appeal.

### 3. *The* Stephenson *Cases – Including This Suit*

In August 2021, a separate group of subscribers sued Indemnity in the Court of Common Pleas, Allegheny County. As the plaintiff had done in *Ritz*, these subscribers, the *Stephenson* plaintiffs, claimed that Indemnity breached its fiduciary duty by setting the management fee at the 25% maximum. But the *Stephenson* plaintiffs' claims differed from the claim in *Ritz* in two respects: they were limited to the management fees set in 2019 and 2020, and they included a failure-to-act theory, specifically the contention that Indemnity should have, but failed to, establish procedures to resolve conflicts of interest between subscribers and Indemnity's

14

controlling shareholders in 2019 and 2020.  Also, as the *Beltz* and *Ritz* plaintiffs had done, the *Stephenson* plaintiffs sued as putative class members and individually, but unlike those prior cases, the *Stephenson* plaintiffs did not sue derivatively on behalf of the Exchange.

With the *Stephenson* plaintiffs attempting to bring a class action in state court, Indemnity invoked CAFA to remove the case to the United States District Court for the Western District of Pennsylvania.  *See* 28 U.S.C. § 1453 (establishing removal jurisdiction over CAFA claims to be coextensive with the original CAFA diversity jurisdiction provision of 28 U.S.C. § 1332(d)).  Before Indemnity filed an answer, the *Stephenson* plaintiffs voluntarily dismissed that case, referred to as *Stephenson I*, without prejudice.  *See* Fed. R. Civ. P. 41(a)(1)(A)(i).

One month later, in December 2021, three of the *Stephenson I* plaintiffs, who were all citizens of Pennsylvania, sued Indemnity again in the Court of Common Pleas, Allegheny County.  Substantively, their claim was the same as the one in *Stephenson I*: they alleged that Indemnity breached its fiduciary duty by setting a 25% management fee in 2019 and 2020 and that Indemnity failed during that same period to establish procedures to resolve conflicts of interest between the subscribers and Indemnity's controlling shareholders.  But unlike in *Stephenson I*, the plaintiffs in the new suit, *Stephenson II*, did not attempt to proceed as a putative class action but rather sued as trustees *ad litem* for the Exchange, *see* Pa. R. Civ. P. 2152, or, alternatively, derivatively on behalf of the Exchange, *see id.* 2177.

Although the *Stephenson II* plaintiffs were not suing as putative class members, Indemnity – as it had done in *Stephenson I* – invoked CAFA to remove the case to the United States District Court for the Western District of Pennsylvania. *Erie Ins. Exch. ex rel. Stephenson v. Erie Indem. Co.*, 2022 WL 4534746, at *1 (W.D. Pa. Sep. 28, 2022), *aff'd*, 68 F.4th 815

15

(3d Cir. 2023). After the parties consented to the jurisdiction of a magistrate judge, the *Stephenson II* plaintiffs moved to remand the case to state court on the ground that the case was not a class action subject to CAFA. *Id.* at \*2. In that motion, the *Stephenson II* plaintiffs indicated that they were prepared to contest the preclusive effect of the previous judgments in Indemnity's favor.

With that indication from the *Stephenson II* plaintiffs, Indemnity initiated this suit, *Stephenson III*, against the *Stephenson II* plaintiffs to enjoin them from proceeding with the *Stephenson II* case in state court. Although *Stephenson II* had been removed to federal court and the briefing on that motion to remand was pending, Indemnity alleged that injunctive relief was needed to effectuate the judgments in *Beltz* and *Ritz* because the claims in *Stephenson II* were barred by claim preclusion and fatally undermined by issue preclusion. Rather than wait for resolution of the *Stephenson II* plaintiffs' motion to remand – and address those affirmative defenses in the state-court proceedings if the motion were granted or in federal court if it were denied – Indemnity invoked the All Writs Act, *see* 28 U.S.C. § 1651, to effectuate the preclusive effects of the prior federal-court judgments in *Beltz* and *Ritz* in the state court. Relying on the same federal statute, Indemnity also sought to permanently enjoin the *Stephenson II* plaintiffs or their privies from challenging "Indemnity's compensation practices pursuant to the Subscriber's Agreement that were the subject of the prior judgments." *Stephenson III* Compl. ¶ 109 (JA65). All parties to *Stephenson III* consented to the jurisdiction of the same magistrate judge who was presiding over *Stephenson II*. *See* 28 U.S.C. § 636(c)(1). Because Indemnity's suit sought to have the federal court that issued the judgments in *Beltz* and *Ritz* determine their preclusive effect, it was within the District Court's ancillary enforcement jurisdiction. *See Johnson v. Mazie*, 144 F.4th 146, 151 (3d Cir. 2025) ("Ancillary enforcement jurisdiction is 'a creature of necessity' that gives 'federal courts the power to enforce their judgments and'

16

ensure 'that they are not dependent on state courts to enforce their decrees.'" (quoting *Nat'l City Mortg. Co. v. Stephen*, 647 F.3d 78, 85 (3d Cir. 2011), *as amended* (Sept. 29, 2011))); *Butt v. United Bhd. of Carpenters & Joiners of Am.*, 999 F.3d 882, 887 (3d Cir. 2021) ("[A]ncillary enforcement jurisdiction exists 'to enable a court to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees.'" (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 380 (1994))); *United States v. Apple MacPro Comput.*, 851 F.3d 238, 244 (3d Cir. 2017) ("[A] court has subject matter jurisdiction over an application for an All Writs Act order only when it has subject matter jurisdiction over the underlying order that the All Writs Act order is intended to effectuate.").

Before any adjudication of Indemnity's requests for injunctive relief in *Stephenson III* could take place, the magistrate judge granted the plaintiffs' motion to remand in *Stephenson II*. *Stephenson*, 2022 WL 4534746, at \*1. Indemnity filed a timely notice of appeal of that decision, and that prompted a series of stays, including stays of the remand order in *Stephenson II* and the proceedings in *Stephenson III*. *Stephenson*, 68 F.4th at 818.

On May 22, 2023, this Court affirmed the remand order in *Stephenson II*. *Id.* at 817. Indemnity challenged that decision through a petition to the Supreme Court for a writ of certiorari. *See* Petition for Writ of Certiorari, *Erie Indem. Co. v. Erie Ins. Exch. ex rel. Stephenson*, 144 S. Ct. 1007 (2024) (No. 23-434). The magistrate judge then extended the stay in *Stephenson II* pending resolution of Indemnity's petition for certiorari. And in *Stephenson III*, the District Court set a briefing schedule for Indemnity to move for a preliminary injunction to enjoin the *Stephenson II* plaintiffs from proceeding with their case in state court.

In seeking a preliminary injunction, Indemnity argued that the judgments in *Beltz* and *Ritz* had claim preclusive effect, and

17

if nothing else, the judgment in *Ritz* on the claim preclusive effect of *Beltz* had issue preclusive effect. The District Court agreed with Indemnity on the claim preclusive effect of *Beltz* and *Ritz*. *Erie Indem. Co. v. Stephenson*, 2024 WL 844370, at *5–9 (W.D. Pa. Feb. 28, 2024). Without the need to address the issue-preclusion argument, the District Court then determined that the other relevant considerations – irreparable harm, the balance of harms, and the public interest – favored a preliminary injunction. *Id.* at *5, *9–10. The District Court entered an order preliminarily enjoining the *Stephenson II* litigation. *Id.* at *1. Through a timely notice of appeal of the order granting the preliminary injunction, the subscribers invoked this Court's appellate jurisdiction. *See* 28 U.S.C. § 1292(a)(1); Fed. R. App. P. 4(a)(1)(A).

## II. DISCUSSION

### A. Legal Standards for Preliminary Injunctions

A preliminary injunction grants injunctive relief during the pendency of a lawsuit, and it is "never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Rather, the appropriateness of such relief depends on four considerations:

1. A reasonable probability of success on the merits of the claim for which injunctive relief is sought;

2. An irreparable harm in the absence of preliminary injunctive relief;

3. A balancing of the equities associated with the possibilities of harms to other interested persons resulting from the grant or denial of injunctive relief; and

4. An assessment of the public interest.

18

*Transcon. Gas Pipe Line Co. v. Pa. Env't Hearing Bd.*, 108 F.4th 144, 150 (3d Cir. 2024).

A party seeking a preliminary injunction bears the burden of proof, *see Winter*, 555 U.S. at 20, and a failure by that party to establish either of the first two considerations – probability of success on the merits and irreparable harm – forecloses such relief, *see Transcon.*, 108 F.4th at 150 (explaining that the first two factors "operate both as essential elements and as factors that guide the exercise of equitable discretion"); *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017) (describing the first two factors as "gateway factors" that must be met before the remaining factors may be weighed). If the moving party makes sufficient showings for those first two considerations, then a court evaluates the relative weights of all four considerations to determine whether preliminary injunctive relief is appropriate. *See Amalgamated Transit Union Loc. 85 v. Port Auth.*, 39 F.4th 95, 103 (3d Cir. 2022).

Because a motion for a preliminary injunction seeks discretionary relief, the grant or denial of such a motion is reviewed for an abuse of discretion. *See Reilly*, 858 F.3d at 176. However, when one of the four preliminary-injunction considerations implicates a question of law, that question is reviewed *de novo*. *See Amalgamated Transit*, 39 F.4th at 102. And when one of the four considerations involves a factual finding, that finding is reviewed for clear error. *See id.*

In addition to these general principles, the remedial powers of federal courts with respect to enjoining state-court proceedings are limited by federal statutes, including the Anti-Injunction Act. *See* 28 U.S.C. § 2283. That statute generally prohibits a federal court from granting "an injunction to stay proceedings in a State court," but it also contains a relitigation exception that allows a federal court to issue such an injunction "to protect or effectuate its judgments." *Id. See generally* Martin H. Redish, *The Anti-Injunction Statute Reconsidered*, 44 U. Chi. L. Rev. 717, 718 (1977) (explaining that after

19

*Toucey v. New York Life Insurance Co.*, 314 U.S. 118 (1941), in which the Supreme Court held that the Anti-Injunction Act did not contain a relitigation exception, Congress amended the statute to include such an exception).

## B. Likelihood of Success on the Merits

In briefing the likelihood of success on the merits of claim preclusion and issue preclusion, the parties relied on the federal standards for both doctrines. Because the *Beltz* and *Ritz* judgments were premised on the exercise of diversity and supplemental jurisdiction, it was more appropriate to apply Pennsylvania preclusion law.[19] But with neither party advancing such a contention, they have both forfeited any argument that Pennsylvania standards should apply. *See Schaffner v. Monsanto Corp.*, 113 F.4th 364, 377 n.6 (3d Cir. 2024) (declining to apply state-preclusion law where all parties briefed federal law). Consequently, Indemnity's claim-preclusion and issue-preclusion arguments, which present pure questions of law, are subject to *de novo* review based on federal preclusion standards. *See Chavez v. Dole Food Co.*, 836 F.3d

---

[19] Federal common law "governs the claim-preclusive effect of a dismissal by a federal court sitting in diversity," meaning that the Supreme Court is ultimately responsible for "prescrib[ing]" the proper scope federal judgments. *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 507–08 (2001). And in exercising that prescriptive discretion, the Supreme Court has instructed that the federal court tasked with enforcing a judgment from another federal court sitting in diversity must apply "the [preclusion] law that would be applied by state courts in the State in which the federal diversity court sits," unless "the state law is incompatible with federal interests." *Id.* at 508–09; *see also Chavez v. Dole Food Co.*, 836 F.3d 205, 225 (3d Cir. 2016) (en banc) (recognizing that "*Semtek* thus directs [this Court] to evaluate the res judicata effects of the [rendering] District Court's timeliness dismissals by looking to [that forum state's] law of claim preclusion").

205, 225 (3d Cir. 2016) (en banc) ("[R]es judicata . . . is, at bottom, a pure question of law."); *Elkadrawy v. Vanguard Grp., Inc.*, 584 F.3d 169, 172 (3d Cir. 2009) ("Our review of an application of res judicata is plenary."); *cf. also Jean Alexander Cosms., Inc. v. L'Oreal USA, Inc.*, 458 F.3d 244, 248 (3d Cir. 2006) (clarifying that the application of collateral estoppel is reviewed *de novo* unless it is "offensive" and "non-mutual").

### 1. Claim Preclusion

As articulated by this Court, the federal standard for claim preclusion consists of three elements:

1.  A final judgment on the merits in a prior suit;

2.  A subsequent suit based on the same cause of action; and

3.  Involvement of the same parties or their privies in both suits.

*Ndungu v. Att'y Gen.*, 126 F.4th 150, 165 (3d Cir. 2025).

The parties here dispute only the second element, the requirement that a subsequent case be based on the same cause of action. That element encompasses not only claims that were actually resolved in the prior suit but also claims that could have been brought in the prior suit. *See Cromwell v. County of Sac*, 94 U.S. 351, 358 (1876) ("[*Res judicata*] applies . . . not only to the points upon which the court was required by the parties to form an opinion, and pronounce a judgment, but to every point which properly belonged to the subject of litigation, and which the parties, exercising reasonable diligence, might have brought forward at the time." (quoting *Henderson v. Henderson*, (1843) 67 Eng. Rep. 313, 319; 3 Hare 100, 115 (Ch.))). Even so, the Supreme Court has explained that "[c]laim preclusion generally 'does not bar claims that are predicated on events that postdate the filing of

21

the initial complaint.'" *Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.*, 590 U.S. 405, 414 (2020) (quoting *Whole Woman's Health v. Hellerstedt*, 579 U.S. 582, 600 (2016)); *see also Morgan v. Covington Township*, 648 F.3d 172, 178 (3d Cir. 2011) (holding that "*res judicata* does not bar claims that are predicated on events that postdate the filing of the initial complaint"). Yet, here Indemnity argues for claim preclusion on precisely that basis. It contends that although the *Beltz* and *Ritz* cases were filed in July 2016 and December 2017 respectively, the judgments in those cases preclude the *Stephenson II* plaintiffs' claims based on Indemnity's actions in December 2019 and December 2020 – setting the management fees at 25% and having conflicted oversight. Because the *Stephenson II* plaintiff's claims are based on events that occurred after the initial complaints in *Beltz* and *Ritz*, the judgments in those cases do not have claim preclusive effect over the challenges now presented by the *Stephenson II* plaintiffs. Thus, the District Court erred in concluding that Indemnity had a likelihood of success on claim-preclusion grounds, and there is no need to separately assess whether the relitigation exception to the Anti-Injunction Act would permit Indemnity's requested injunction.[20]

### 2. Issue Preclusion

Indemnity also defends the District Court's grant of a preliminary injunction based on collateral estoppel. Specifically, it advances a preclusion-on-preclusion theory: the decision in *Ritz* on the claim preclusive effect of *Beltz* has issue preclusive effect for the *Stephenson II* plaintiffs.

For a prior judgment to have issue preclusive effect, an issue of fact or law must have been "actually litigated and

---

[20] *Cf. generally Smith v. Bayer Corp.*, 564 U.S. 299, 306–08 (2011) (providing guiding principles regarding the application of the relitigation exception); *Chick Kam Choo v. Exxon Corp.*, 486 U.S. 140, 148 (1988) (same).

resolved in a valid court determination essential to the prior judgment." *New Hampshire v. Maine*, 532 U.S. 742, 748–49 (2001). To meet that requirement, there must be an "identity of issues" between those decided in the prior case and those for which preclusion is sought. *Raytech Corp. v. White*, 54 F.3d 187, 191 (3d Cir. 1995); *cf. Smith v. Bayer Corp.*, 564 U.S. 299, 307 (2011). Here, the two issues for comparison are the claim preclusive effect of *Beltz* on the claims brought in *Ritz* and the claim preclusive effect of *Beltz* on the claims brought by the *Stephenson II* plaintiffs.

The first issue was decided in *Ritz*. That decision determined that the holding in *Beltz* – that the breach-of-fiduciary duty claims based on the management fees Indemnity charged from 1997 to 2016 and the late fees Indemnity charged from 2008 to 2016 fell outside of the two-year statute of limitations, *Beltz*, 279 F. Supp. 3d at 581–83; *Beltz*, 733 F. App'x at 599 – had claim preclusive effect on the breach-of-fiduciary duty claims in *Ritz*, which were based on the management fees set in December 2006 to 2016 for the next year. The lynchpin of that holding was that the breach-of-fiduciary-duty claims in *Ritz* could have been brought in *Beltz*. *Ritz*, 2019 WL 438086, at *4. Indeed, the *Ritz* decision made clear that "Ritz's complaint does not include any new material facts that occurred after the filing of the [*Beltz*] complaint." *Id*.

The issue presented here seeks to extend the claim preclusive effect of *Beltz* to the *Stephenson II* plaintiffs' claims based on new material facts: Indemnity's setting of management fees in 2019 and 2020 as well as its oversight in those years. The *Ritz* decision on claim preclusion did not address that issue, and hence the issues are not identical. *See Raytech*, 54 F.3d at 191 (focusing the "precise question or questions at issue" in the two cases). Without an identity of issues, Indemnity has not demonstrated a likelihood of success on issue preclusion, making it unnecessary to address whether

23

Indemnity's requested injunction fits within the relitigation exception to the Anti-Injunction Act.[21]

### III.    CONCLUSION

Because Indemnity did not demonstrate a likelihood of success on the merits on either claim or issue preclusion, the District Court abused its discretion in granting Indemnity's motion for a preliminary injunction, and it is not necessary to address the remaining three considerations for preliminary injunctions. *See Transcon.*, 108 F.4th at 151 ("[I]f there is an 'insuperable' barrier to the plaintiff's ability to succeed on the merits . . . , then an analysis of the remaining considerations is unnecessary." (quoting *Munaf v. Geren*, 553 U.S. 674, 691 (2008))).  We will therefore vacate the order of the District Court granting such relief.

---

[21] *See generally Smith*, 564 U.S. at 307-08 (setting forth the requirements for relying on the relitigation exception to enjoin a state-court proceeding based on issue preclusion).